ANTHONY B. CRISTO AND MARY G. CRISTO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cristo v. Commissioner
Docket No. 12000-79.
United States Tax Court
T.C. Memo 1982-514; 1982 Tax Ct. Memo LEXIS 224; 44 T.C.M. (CCH) 1057; T.C.M. (RIA) 82514; September 13, 1982. *224 (1) Petitioners bought an apartment house in 1973; they made rehabilitation expenditures in each of the years 1974 through 1977. Held: petitioners did not make a valid election of 60-month depreciation under section 167(k), I.R.C. 1954, nor did they properly request permission to change from straight line depreciation to 125-percent declining balance depreciation otherwise available under section 167(j), I.R.C. 1954. (2) Southern pine beetles destroyed pine trees in two attacks on petitioners' property, giving rise to what the parties agree is a "casualty" loss from each attack, under section 165(c)(3), I.R.C. 1954. Held: amounts of losses determined. (3) Petitioners set aside a room in their home for use as an office. Held: petitioners have failed to show they satisfied the requirements of section 280A(c)(1), I.R.C. 1954. Anthony B. and Mary G. Cristo, pro se. William L. Ringuette, for the respondent. CHABOT
MEMORANDUM FINDINGS *228 OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners, and petitioners claimed overpayments, as follows: Deficiency
Overpayment
Year
Determined
Claimed
1975
$1,974.25
$6,195
1976
6,022.19
4,055
1977
9,926.53
9,800
After concessions by petitioners, the issues for decision are: (1)(a) Whether petitioners validly elected the benefits of the 60-month depreciation period provided by section 167(k), [1] and if not, then (b) whether petitioners are entitled to the benefits of the 125-percent declining balance depreciation method provided by section 167(j); (2) Whether petitioners are entitled to deductions on account of their casualty losses resulting from southern pine beetle damage to their property in 1976 and 1977; and (3) Whether petitioners are entitled to deduct office-in-the-home expenses for 1976 and 1977. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits *229 are incorporated herein by this reference. When the petition in this case was filed, petitioners Anthony B. Cristo (hereinafter sometimes referred to as "Anthony") and Mary G. Cristo (hereinafter sometimes referred to as "Mary"), husband and wife, resided in Farmville, Virginia. Accelerated depreciation
On October 6, 1973, petitioners bought an apartment building located at 507 Buffalo Street, Farmville, for $44,400. (This building is hereinafter sometimes referred to as "the apartment house".) The apartment house had four apartments. Petitioners began to renovate the apartment house shortly after they bought it, in order to convert it into eight apartments to be used for rental purposes. By the end of 1974, three or four of the apartments had been completed. In 1974, petitioners started renting these apartments at monthly rates of $140 to $200. The last of the eight apartments was completed in 1976 (all eight of the apartments were rented by the end of 1975). Petitioners made rehabilitation expenditures (within the meaning of section 167(k)) on the apartment house as shown in table 1. These capital expenditures are in addition to petitioners' original cost of $44,400. *230 Table 1 Amount
Cumulative
Year
for Year
Total
By the end of 1974
$72,371
$72,371
1975
8,346
80,717
1976
15,403
96,120
1977
1,616
97,736
Thus, through 1977 petitioners' rehabilitation expenditures on the apartment house averaged $12,217 per apartment. On their original tax returns for 1974, 1975, and 1976, petitioners deducted depreciation on account of the apartment house on the straight line method at the rate of four percent (25-year useful life). Petitioners did not attach any statements to their original tax returns for 1974, 1975, and 1976 evidencing any election under section 167(k). Line 2 ("Other depreciation") of schedule C-2.--Depreciation, attached to petitioners' 1977 tax return, provides the information set forth in table 2. Table 2 Column
Information
a. Description of property
Apartment house (8 apts)
b. Date acquired
Oct 6, 1973
c. Cost or other basis
142,136
d. Depreciation allowed or
79,371
allowable in prior years
e. Method of computing depreciation
See attached
f. Life or rate
5 years
g. Depreciation for this year
31,883.00
Attached to the 1977 tax return *231 is a statement to the effect that (1) petitioners also enclose Forms 1040X for 1974, 1975, and 1976; (2) when petitioners' 1973 and 1974 tax returns were being audited, they were advised by the examining agent to to depreciate the apartment house over 35 years; (3) when petitioners "objected and protested" that they understood that a shorter useful life was available, they were told that no shorter useful life would be accepted; (4) in November 1977 they learned that, in 1969, the Congress had approved a 60-month straight-line write-off, and (5) they claim a net operating loss for 1977 and increased deductions for 1974, 1975, and 1976. Petitioners did not attach to their original tax returns for 1974 through 1977, or to their Forms 1040X for 1974, 1975, and 1976, any statement regarding income certifications. Petitioners did not obtain income certifications (see sec. 1.167(k)-3(b)(4), Income Tax Regs., at n. 4, infra) from their tenants in the apartment house. Petitioners did not file any request for respondent's permission to change from straight line depreciation to 125-percent declining balance depreciation. Casualty loss
Petitioners' home was on a seven-acre parcel *232 of land they owned in a residential area of Farmville. In 1976 and again in 1977 attacks by southern pine beetles killed a number of pine trees on this parcel. After each of the beetle attacks, Anthony cut down and removed the dead trees by himself. He used his own chain saw and other cutting implements (such as hatchets and machetes), as well as his garden tractor. Anthony took about eight days in 1976 and about 10 days in 1977 to complete the cleanup from the 1976 attack and to begin the cleanup from the 1977 attack. Petitioners did not apply for reimbursement from the company that carried their home insurance, because that company did not insure against loss of trees. The land surrounding petitioners' home was heavily wooded before the pine beetle infestations. After the trees were killed, cut down, and removed, the land remained heavily wooded. The fair market value of petitioners' property was reduced by $1,000 in 1976 because of the 1976 southern pine beetle attack which killed pine trees on the property. The fair market value of petitioners' property was reduced by $1,000 in 1977 because of the 1977 southern pine beetle attack which killed pine trees on the property. *233 Office in the home
In 1976 and 1977, petitioners were the sole occupants of their home, an eight-room house in Farmville. One of these rooms, about 22 feet by 30 feet in area, was used as petitioners' office (hereinafter sometimes referred to as "the office room"). In the office room in 1976 and 1977 were two desks, a file cabinet, couches, chairs, and bookshelves. Both desks were used by both petitioners. Tenant leases, tenant files, and tax records were kept in the file cabinet and the desks. The couches were used for interviewing tenants and taking tenant complaints. The bookshelves stretched across an entire wall of the office room and had on them books dealing with real estate, investing, depreciation, and economics. Petitioners did not do any entertaining in the office room. Petitioners spent or incurred for their office room $1,236 for 1976 and $1,349 for 1977, the amounts they claimed as deductions on their tax returns for these years. Both petitioners were employed as professors at Longwood College, in Farmville. Anthony taught economics and Mary, who had finished her doctoral work in 1975, taught sociology and anthropology. Longwood paid salaries *234 to petitioners in the amounts shown in table 3. Table 3 Petitioner
1976
1977
Anthony
$16,765
$16,150
Mary
15,585
15,050
Totals
$32,350
$31,200
Anthony's office at Longwood College lacked space for the economics books and materials he required in his work as a professor, and so he kept these books and materials in the office room. Anthony was paid army retirement pay of $13,672.28 in 1976 and $14,548.80 in 1977. Petitioners reported on their tax returns interest and dividend income of $1,233 (less $40 exclusion for dividends) for 1976 and $2,274 (less $200 exclusion for dividends) for 1977. As to their apartment house business, petitioners reported on their original tax returns as follows: for 1976, a profit of $1,378, [2] and for 1977, a loss of $26,813. OPINION I. Accelerated Depreciation
(a) Section 167(k)
Petitioners maintain that their intent "in renovating the *235 apartment house was to offer the apartments for rent to middle and low income groups." Petitioners assert that their original decision to depreciate their expenditures over 25 years was based on erroneous information provided by respondent's examining agent, that they took steps to correct the situation promptly upon learning of the examining agent's error, and that they should not be denied benefits because of this error. Petitioners contend that they are entitled to depreciate their rehabilitation expenditures over a 60-month period. Respondent concedes that petitioners' expenditures qualify as rehabilitation expenditures under the statute, but argues that petitioners are not entitled to the claimed deductions because neither their original tax returns for 1974 through 1977 nor their Forms 1040X include the election or information statement required by Treasury Regulations. In particular, respondent argues that (1) no income certifications of the occupants were provided and (2) no election under section 167(k) may be made in an amended tax return. We agree with respondent's first argument. Section 167(k) provides that taxpayers may elect to depreciate over 60 months their *236 expenditures to rehabilitate low-income housing. Such an election is to be made "in accordance with regulations prescribed by the Secretary" (sec. 167(k)(1)). [3]
*237 The regulations provide rules for the manner of making the election. [4]
*238 Petitioners did not attach to any of their tax returns for the years in issue any statement regarding the income certifications required by sec. 1.167(k)-3(b)(4), Income Tax Regs. Petitioners did not secure the required income certifications from their tenants. Petitioners have not complied with the requirements of the regulations regarding the income certifications; they have not substantially complied with the regulations (cf. Tipps v. Commissioner,74 T.C. 458 (1980)), and accordingly we conclude that they are not entitled to the benefits of section 167(k). Petitioners rely in the instant case on their having received had advice from respondent's examining agent. We do not know precisely what petitioners told the examining agent, nor what advice the auditor gave them. Whatever the error or misunderstanding, it seems to have been as to whether there was available to petitioners a 60-month write-off with respect to all or some of their capital expenditures; this is a matter of law, not of fact. For there to be an equitable estoppel, "the error must be in a statement of fact and not in an opinion or a statement of law". *239 Estate of Emerson v. Commissioner,67 T.C. 612, 618 (1977). Respondent may correct mistakes of law ( Automobile Club of Michigan v. Commissioner,353 U.S. 180, 183 (1957)) and "He may do so even where a taxpayer may have relied to his detriment on the Commissioner's mistake" ( Dixon v. United States,381 U.S. 68, 73 (1965)). We see no basis for waiving the requirements of the regulations because of the advice petitioners may have received from respondent's examining agent. See Zuanich v. Commissioner,77 T.C. 428, 432 (1981), on appeal (CA9 Nov. 13, 1981). Under thse circumstances we make no effort to determine the relevance to the 1977 rehabilitation expenditures of respondent's argument that section 167(k) elections may not be made on amended tax returns, nor do we attempt to determine the impact on sec. 1.167(k)-4(f), Income Tax Regs., on this argument. We hold for respondent on this issue. (b) Section 167(j)(5)
Petitioners maintain in the alternative that they are entitled to depreciate the apartment house under the 125-percent declining balance method (sec. 167(j)(5)).[5] Respondent concedes that petitioners *240 would have been entitled to so depreciate the apartment house under section 167(j) if they had used that method on their 1974 tax return or had complied with the provisions of Rev. Proc. 74-11, 1974-1 C.B. 420, by filing the form there required within the first 180 days of the year in which the change is to become effective. However, respondent argues, petitioners are not now entitled to use that method, because they neither used that method on their 1974 tax return nor properly requested permission to change to that method. *241 We agree with respondent. On their original tax returns for 1974, 1975, and 1976, petitioners deducted depreciation under the straight line method. This is a permissible method. (Secs. 167(b)(1), 167(j)(5)(A).) A change from the straight line method to a declining balance method is a change in method of accounting; in order to accomplish this, petitioners were required to secure respondent's consent. Sec. 446(e); [6]Foley v. Commissioner,56 T.C. 765, 770 (1971). Having failed to seek and obtain such consent, petitioners cannot now use a declining balance method. *242 We hold for respondent on this issue. II. Casualty Loss
Petitioners claim casualty loss deductions of $6,500 for 1976 and $6,125 for 1977 (less $100 for each year) on account of the destruction of about 50 pine trees each year.After consulting with insurance companies and others who estimated the value of similar trees at $200 or $250 per tree, petitioners deducted $125 per tree. Respondent concedes that petitioners sustained a casualty loss [7] in each year, but maintains that petitioners have failed to show the amounts of the losses, and so they should not be allowed to deduct any amount. We agree with petitioners that some loss deduction is allowable. Section 165[8] permits individuals to deduct nonbusiness casualty losses to the extent not compensated for by insurance or otherwise. The measure of such a loss has generally been said to be the difference between the fair market value *243 of the property immediately before the casualty and its fair market value immediately thereafter, but not exceeding its adjusted basis. See Helvering v. Owens,305 U.S. 468, 471 (1939); Lamphere v. Commissioner,70 T.C. 391, 395 (1978); sec. 1.165-7(b)(1), Income Tax Regs.
*244 Trees are treated as an integral part of residential real property, and no separate basis or determination of loss is allocated to them. The loss from damage to, or killing of, trees is the decrease in the value of the overall property. Western Products Co. v. Commissioner,28 T.C. 1196, 1219 (1957); sec. 1.165-7(b)(2)(ii), Income Tax Regs. Thus, we do not focus on the separate value of the trees. We do not have evidence that bears directly on the fair market value of the property, neither before nor after either of the losses. The photographs introduced by petitioners show heavily wooded areas in several directions from petitioners' home. This suggests that the deaths and removals of the trees served to thin the woods but not to denude the land. We are not convinced that the fair market value of the property after it was cleared of the dead trees was less the fair market value of the property before the beetle attacks. However, we believe that, if a person acquired property on which there were pine trees that were the victims of a southern pine beetle attack, then that person would expect to cut down and remove the dead trees, and that person would *245 reduce any offering price by the expected cost of this clearing operation. This, of course, would result in reductions in fair market value. The fact that Anthony, by his labors in clearing the property of the dead trees, may have restored the property to its former fair market value does not affect our conclusion that there were deductible losses. Doing the best we can with the record before us (see Cohan v. Commissioner,39 F.2d 540 (CA2 1930)), we have found that the 1976 and 1977 beetle attacks resulted in losses of $1,000 in each of these years, and we so hold. The deduction in each year is $900 (the $1,000 loss minus the $100 statutory "floor"). III. Office in the Home
Section 280A[9] forbids allowance of deductions for expenses of an office in the home unless the taxpayer surmounts a series of hurdles. *246 Respondent asserts that petitioners have failed to surmount several of these hurdles in that they did not use the office room "exclusively and regularly as their principal place of business, and that [they did] not meet with customers there in the ordinary course of business." [10] Respondent does not question the amounts of petitioners' office room expenses. Petitioners maintain that they had to use their home for an office because they had no place available in the apartment house to serve the functions that the office room served, that the office room was used exclusively on a regular basis for the apartment house business, and that the office room was used (1) by prospective tenants for interviews and (2) by tenants for making complaints. *247 We agree with respondent. On the basis of the record in the instant case, we are satisfied that, but for section 280A, petitioners would be entitled to the deductions they seek for the office room.However, the Congress enacted section 280A as part of the Tax Reform Act of 1976 (Pub. L. 94-455) because of dissatisfaction with the way the courts were applying sections 162 (allowing deductions for trade or business expenses) and 262 (disallowing deductions for personal, living, and family expenses).More specifically, the Congress was concerned that the courts were allowing deductions for what the Congress believed should be characterized as personal expenses. H. Rept. 94-658, pp. 157-160, 1976-3 C.B. (Vol. 2) 695, 849-852; S. Rept. 94-938, pp. 144-147, 1976-3 C.B. (Vol. 3) 49, 182-185; General Explanation of the Tax Reform Act of 1976, Staff of the Joint Committee on Taxation, pp. 136-139, 1976-3 C.B. (Vol. 2) 1, 148-151. In structuring section 280A, the Congress laid down as a general rule a prohibition on deductions with respect to use of the taxpayer's residence (sec. 280A(a)), but provided a series of exceptions, each with its own exceptions *248 and limitations. Section 280A(c)(1) provides an exception from the general prohibition in those situations where a business use satisfies a series of requirements. Before examining the details of the requirements, it is appropriate to point out that petitioners' use of the office room in connection with the apartment house business does not disqualify them from the section 280A(c)(1) exception merely because the apartment house was not petitioners' principal trade or business. Curphey v. Commissioner,73 T.C. 766, 775-777 (1980), on appeal (CA9 Nov. 24, 1980). [11]
*249 Petitioners have the burden of proving that they have satisfied all of the requirements of section 280A that have been properly challenged (see n. 10, supra) by respondent. See Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Paragraph (1) of section 280A(c) provides an exception if a specific use meets the requirements of all of the following: (a) the opening flush language of the paragraph, (b) one of the three subparagraphs, and (c) the closing flush language of the pragraph. We conclude that (1) petitioners have failed to show that the office room was the principal place of business for the apartment house business, and (2) petitioners have failed to show that the office room was regularly used by the apartment house tenants and prospective tenants in the normal course of the apartment house business. (1) Principal place of business
In determining whether the office room was the principal place of business for petitioners' apartment house business (sec. 280A(c)(1)(A)), we must examine the various locations in which petitioners conducted this business and ascertain which location was the "focal *250 point" of their activities in this business. Jackson v. Commissioner,76 T.C. 696, 700 (1981); Baie v. Commissioner,74 T.C. 105, 109 (1980). See Green v. Commissioner,78 T.C. 428, 433 (1982). Petitioners have indicated the kind of work they did in the office room, but not the extent or frequency of this work.Petitioners have not indicated what they did at the apartment house, nor have they indicated the extent or frequency of their work in the apartment house. Petitioners stress the importance of the office room and the unavailability of space to conduct such office work at the apartment. We believe them. However, it is obvious that the apartment house is essential to the apartment house business. Without the apartment house, there would be nothing to rent, no income from the business. The taxpayer in Baie v. Commissioner,supra, prepared food and did all her bookkeeping in her home; she sold the food at a hot dog stand 0.7 miles from her home. In Baie we concluded that the focal point was the hot dog stand, however beneficial the home opertions may have been to the business. On the basis *251 of the record in the instant case, petitioners have failed to persuade us that the focal point of the apartment house business was the office room and not the apartment house. Petitioners rely heavily on Curphey v. Commissioner,supra. On this point, their reliance is misplaced. In Curphey, we noted as follows (73 T.C. at 776, n. 11): Respondent concedes that, if we determine (as we have) that petitioner was engaged in a trade or business in respect of his rental properties, "his activities with regard to that business are conducted in the home office," i.e., that petitioner's home office was his principal place of business with respect to his rental activities. In this connection, we note that, in some situations, there may be a substantial question whether the taxpayer's home or his rental properties constitute his principal place of business. This concession was significant in our holding for the taxpayer in Curphey (73 T.C. at 777). This concession has not been made by respondent in the instant case. We hold that petitioners have failed to prove that they met the requirements of section 280A(c)(1)(A). (2) Use *252 by customers, etc.
Petitioners maintain that they have shown that the office room was "exclusively used on a regular basis * * * as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business" (sec. 280A(c)(1)(B)). This is an alternative which avoids the necessity of meeting the "principal place of business" requirement of section 280A(c)(1)(A). Petitioners have testified that the office room was used to interview prospective tenants and to receive complaints from tenants. We believe their testimony. However, petitioners have given us no information as to the frequency or regularity of this use.
In Green v. Commissioner,78 T.C. at 436, we concluded that the telephone calls to the home office there involved "were not incidental or occasional but rather were regular and continuous, consuming an average in excess of 2 hours, 5 evenings each week". In the instant case we know that there were eight apartments in the apartment house. By some time in 1975, all eight apartments had been rented. The record does not indicate, even in general terms, how often prospective *253 tenant interviews took place in the office room in 1976 or 1977, nor does it indicate how often meetings about complaints took place in the office room in 1976 or 1977. We do not suggest that the frequency or regularity of meetings or dealings must match the level we faced in Green, in order to meet the requirements of section 280A(c)(1)(B). However, in the instant case we have so little information that we cannot tell whether the facts, if we knew them, would satisfy any reasonable interpretation of the statute's requirements. We hold that petitioners have failed to prove that they met the requirements of section 280A(c)(1)(B). Petitioners do not contend that they qualify under subparagraph (C) (relating to separate structures), so as to give them an alternative to satisfying the requirements of subparagraph (A) or (B). Under the circumstances, it is not necessary to decide whether Anthony's use of the office room, to keep some part of his economics library, violates the "exclusively used" requirement of the opening flush language of paragraph (1) of section 280A(c). To take into account our holding on the casualty loss issue, Decision will be entered under Rule *254 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. On their original tax return for 1976, petitioners deducted depreciation on the apartment house in the amount of $5,621. This was changed to $30,515 on their Form 1040X for 1976, resulting in a reported loss of $23,576 from the apartment house.↩
3. SEC. 167. DEPRECIATION. (k) Depreciation of Expenditures To Rehabilitate Low-Income Rental Housing.-- (1) 60-month rule.--The taxpayer may elect, in accordance with regulations prescribed by the Secretary or his delegate, to compute the depreciation deduction provided by subsection (a) attributable to rehabilitation expenditures incurred with respect to low-income rental housing after July 24, 1969, and before January 1, 1975, under the straight line method using a useful life of 60 months and no salvage value. Such method shall be in lieu of any other method of computing the depreciation deduction under subsection (a), and in lieu of any deduction for amortization, for such expenditures. [Sec. 167(k)↩ was amended by sec. 3(c) of the so-called "pins and needles" Act (Pub. L. 93-625, 88 Stat. 2109); secs. 203(a) and 1906(a)(13) [sic] (A) of the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1530, 1834); sec. 4(a) of Pub. L. 95-171 (91 Stat. 1355); sec. 367 of the Revenue Act of 1978 (Pub. L. 95-600, 92 Stat. 2857); sec. 3 of the so-called "tax treatment extension act of 1980" (Pub. L. 96-541, 94 Stat. 3205); and sec. 264(a) of the Economic Recovery Tax Act of 1981 (Pub. L. 97-34, 95 Stat. 264). The amendments which apply to one or more of the years in issue essentially postpone the expiration of the provision; otherwise, none of the listed amendments affects the instant case.]
4. Sec. 1.167(k), Income Tax Regs., provides, in pertinent part, as follows: Sec. 1.167(k)-1. Depreciation of property attributable to rehabilitation expenditures. (a) In general. (1) In the case of property attributable to rehabilitation expenditures incurred with respect to low-income rental housing after July 24, 1969, and before January 1, 1975, a taxpayer may elect under section 167(k) to compute the depreciation deduction provided by section 167(a) by using the straight line method, a useful life of 60 months, and no salvage value, in lieu of any other method of computing the reasonable allowance referred to in section 167(a). The expenditures must meet the conditions and limitations contained in secs. 1.167(k)-2 and 1.167(k)-3 and the election must be made as prescribed in sec. 1.167(k)-4. * * * [Sec. 1.167(k)-1(a)(1) was amended by T.D. 7642, 1979-2 C.B. 98, 100, to substitute "January 1, 1982" for "January 1, 1975".] Sec. 1.167(k)-3. Definitions. (b) Low-income rental housing--* * * (4) Income certifications. A taxpayer electing to compute depreciation under section 167(k) with respect to any property contained in a dwelling unit shall secure an income certification from the tenant covering each person who proposes to live in such unit after the close of the certification year. If a dwelling unit is subleased during the taxable year and the taxpayer elects to compute depreciation under section 167(k) with respect to any property contained in such unit, the taxpayer shall secure an income certification from the subtenant covering each person who proposes to live in the dwelling unit after the close of the certification year. If the dwelling unit is rented to a new tenant or subtenant during the 60-month election period, the taxpayer shall secure an income certification from the new tenant (or subtenant) covering each person who proposed to live in the unit after the close of the certification year. The income certification shall state the gross income from all sources for the certification year (as defined in subparagraph (3) of this paragraph) of each person who proposes to live in the dwelling after the close of the certification year. If the taxpayer elects to use the method described in subparagraph (3)(ii) of this paragraph, the income certification shall state the business expenses claimed as a deduction for the certification year by the persons who propose to occupy the dwelling unit. If the taxpayer elects to use the method described in subparagraph (3)(iii) of this paragraph, the income certification shall state the number of minors who propose to live in the dwelling unit after the close of the certification year, the income earned by such minors during the certification year, and any unusual or temporary income earned during the certification year and the circumstances and nature of such income. The income certification must be sworn to before an official authorized to administer oaths (such as a notary public) and shall be maintained by the taxpayer as part of his books and records. [Sec. 1.167(k)-3(b) was amended by T.D. 7642, 1979-2 C.B. 98, 102-103, primarily to revise the last three sentences of subparagraph (4), and to add subparagraphs (5) and (6), as follows: The income certification shall contain a statement of the anticipated total annual income for the certification year of each persons who proposes to live in the dwelling unit during the certification year, the number of minors who propose to live in the dwelling unit during the certification year, and the anticipated total annual income of such minors, all determined in accordance with the criteria prescribed by the Secretary of Housing and Urban Development referred to in paragraph (b)(3) of this section. The income certification must be maintained by the taxpayer as part of its books and records. (5) Verifications of income certification. In the case of property attributable to expenditures paid or incurred after July 24, 1969, the income certification must be either-- (i) Sworn to before an officer authorized to administer oaths (such as a notary public) or (ii) On a form which meets the following two requirements: (A) The form contains a warning that it is a criminal offense to make a willfully false statement or misrepresentation to any department or agency of the United States as to any matter within its jurisdiction.(B) The form is signed by the tenant (or subtenant) in connection with an application (or other requirement) for a subsidy, rent supplement, mortgage insurance, or other form of assistance to either the taxpayer or the tenant (or subtenant) from a department or agency of the United States.
(6) Effective date--(i) In general. Paragraph (b)(2), (3), (4), and (5) of this section applies to property attributable to expenditures which are paid or incurred after December 31, 1975. Except to the extent paragraph (b)(5) of this section applies, in the case of property attributable to expenditures paid or incurred before January 1, 1976, the rules in 26 CFR 1.167(k)-3(b)(2), (3), and (4), revised as of April 1, 1978, continue to apply. (ii) Transitional rule for change in certification year. In the case of property attributable to expenditures paid or incurred after December 31, 1975, the taxpayer may determine whether the occupants (including a subtenant) of any dwelling unit are families and individuals of low or moderate income by applying all of the rules in paragraph (b)(2), (3), and (4) of this section, as in effect before being revised by T.D. 7642. However, the rules in paragraph (b)(5) of this section (as revised by T.D. 7642), relating to the verification of income certifications, shall apply. This subdivision (ii) applies only if the income certification is signed by the tenant (or subtenant) on or before June 7, 1978. (iii) Expenditures treated as paid or incurred by the taxpayer. For purposes of applying this subparagraph (6), rehabilitation expenditures treated as having been paid or incurred by the taxpayer by reason of sec. 1.167(k)-1(b) shall be deemed to have been paid or incurred on the date on which the expenditures were actually paid or incurred, determined in accordance with the method of accounting used by the person that actually paid or incurred the expenditures.] Sec. 1.167(k)-4. Time and manner of making election. (a) Manner of election--(1) In general. An election under section 167(k) shall be made by attaching a statement to the income tax return filed for the first taxable year in which the taxpayer computes the depreciation deduction using a 60-month useful life. An information statement shall be attached to the income tax return filed for each subsequent taxable year in which the taxpayer computes depreciation under section 167(k). * * * (b) Information required--(1) Election year. The election to compute depreciation under section 167(k) with respect to any property must contain the following information: (vi) Statement that all income certifications required by sec. 1.167(k)-3(b)(4) have been obtained. (2) Subsequent years. For each taxable year in which depreciation is computed under section 167(k) after the taxable year of the election, the statement required by this section must state the rental charges for each occupied unit and the rental charge at which each vacant unit is offered. In addition, if any such unit is rented to a new tenant during the taxable year, such statement must also contain the following information: (i) A statement that such tenant has signed an income certification (sec. 1.167(k)-3(b)(4)), and (ii) The number of occupants in the unit, the maximum income level permissible under sec. 1.167(k)-3(b)(2) for that number of occupants, and the total adjusted income of such occupants, determined solely from the income certifications required by sec. 1.167(k)-3(b)(4)↩.
5. SEC. 167. DEPRECIATION (j) Special Rules for Section 1250 Property.-- (5) Used residential rental property.--In the case of section 1250 property which is residential rental property (as defined in paragraph (2)(B)) acquired after July 24, 1969, having a useful life of 20 years or more, the original use of which does not commence with the taxpayer, the allowance for depreciation under this section shall be limited to an amount computed under-- (A) the straight line method, (B) the declining balance method, using a rate not exceeding 125 percent of the rate which would have been used had the annual allowance been computed under the method described in subparagraph (A), or (C) any other method determined by the Secretary or his delegate to result in a reasonable allowance under subsection (a), not including-- (i) the sum of the years-digits method, (ii) any declining balance method using a rate in excess of the rate permitted under subparagraph (B), or (iii) any other method allowable solely by reason of the application of subsection (b)(4) or paragraph (1)(C) of this subsection. [The amendment of this provision by sec. 1906(a)(13) [sic] (A) of the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1834), applies to 1977 but does not affect the instant case.]↩
6. SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING. (e) Requirement Respecting Change of Accounting Method.--Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate. [The amendment of this provision by sec. 1906(a)(13) [sic] (A) of the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1834) applies to 1977 but does not affect the instant case.]↩
7. See Rev. Rul. 79-174, 1979-1 C.B. 99. See also Maher v. Commissioner,76 T.C. 593, 597 n. 10 (1981), affd. 680 F.2d 91 (CA11 1982); Coleman v. Commissioner,76 T.C. 580, 591↩ n. 10 (1981), on appeal (CA6 Sep. 24, 1981).
8. Section 165 provides, in pertinent part, as follows: SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
(b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. * * *↩
9. Section 280A provides, in pertinent part, as follows: SEC. 280A. DISALLOWANCE OF CERTAIN EXPENSES IN CONNECTION WITH BUSINESS USE OF HOME, RENTAL OF VACATION HOMES, ETC. (a) General Rule.--Except as otherwise provided in this section, in the case of a taxpayer who is an individual * * *, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence. (c) Exceptions for Certain Business or Rental Use; Limitation on Deductions for Such Use.-- (1) Certain business use.--Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis-- (A) [as] the principal place of business for any trade or business of the taxpayer. [,] (B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or (C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business. In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer. (5) Limitation on deductions.--In the case of a use described in paragraph (1), (2), or (4), and in the case if a use described in paragraph (3) where the dwelling unit is used by the taxpayer during the taxable year as a residence, the deductions allowed under this chapter for the taxable year by reason of being attributed to such use shall not exceed the excess of-- (A) the gross income derived from such use for the taxable year, over (B) the deductions allocable to such use which are allowable under this chapter for the taxable year whether or not such unit (or portion thereof) was so used. [The foregoing reflects amendments enacted in 1977 (by sec. 306 of Pub. L. 95-30, 91 Stat. 152-153) and 1981 (by sec. 113(c) of Pub. L. 97-119, 95 Stat. 1642), which apply to taxable years beginning after December 31, 1975.]↩
10. On brief, respondent raises the additional objection that "under the limitations of section 280A(c)(5) petitioners have not established the amount of gross income allocable to the home office. * * * The burden of proof with respect to that allocation lies with the petitioner [sic] * * * which they have failed to carry." This position is not fairly comprehended in the explanation in the notice of deficiency and it was not referred to at the trial. Additional evidence would be required in order to make a determination on this point. Under these circumstances, we will not consider this issue. See Markwardt v. Commissioner,64 T.C. 989, 997-998↩ (1975).
11. Respondent maintaidned on brief that our position in Curphey is erroneous. On December 29, 1981, after the briefs were filed, the Congress amended section 280A(c)(1)(A), retroactively to the initial effective date of section 280A. The Staff of the Joint Committee on Taxation, in its Summary of H.R. 5159, The Black Lung Benefits Revenue Act of 1981 (Including Other Tax Provisions Adopted) (JCS-70-81) described this amendment as follows: Under the Act, it is made clear that a taxpayer can have a principal place of business for each separate business of the taxpayer and if the regular and exclusive use tests are met, can deduct the expenses attributable to using his residence as the principal place of business for one or more such businesses. On October 19, 1981, John Chapoton, Assistant Secretary of the Treasury for Tax Policy, testified before the Subcommittee on Select Revenue Measures of the Committee on Ways and Means of the House of Representatives. He discussed our Curphey opinion, agreed with the approach embodied in the opinion, and advised the Subcommittee that it was unnecessary to enact any of the pending bills dealing with this point because the Treasury Department intended to make the change by regulation; he suggested a technical modification to the bills if the Congress decided to enact legislation. The Congress embodied the suggested technical modification in the legislation it enacted. See Hearings on Legislative Proposals Relating to Section 280A and Other Minor Tax Bills, Before the Subcomm. on Select Revenue Measures of the House Comm. on Ways and Means, 97th Cong., 1st Sess. 10, 12-13 (1981). In view of these recent developments, we assume that respondent no longer contends that petitioners should lose merely because the apartment house was not their principal business.↩